UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

TUTOR PERINI CORPORATION and
FRONTIER-KEMPER CONSTRUCTORS, INC.,                    Case No.: _____

                                Plaintiffs,

        -against-                                      **COMPLAINT**

METROPOLITAN TRANSPORTATION AUTHORITY,

                                Defendant.
_____

        Plaintiffs Tutor Perini Corporation ("TPC") and Frontier-Kemper Constructors, Inc.
("FKC") (collectively, "Plaintiffs"), by and through their attorneys, Hinckley, Allen & Snyder
LLP, as and for their Complaint against Defendant Metropolitan Transportation Authority
("MTA"), hereby allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

        1.      This action is brought to seek redress for the hundreds of millions of dollars that is
owed to Plaintiffs by the MTA under four contracts, pursuant to which Plaintiffs have successfully
completed construction work on the MTA's East Side Access Program ("ESA Program"), a multi-
billion-dollar infrastructure project designed to connect the Long Island Railroad to Grand Central
Terminal in Manhattan.

        2.      The MTA's misconduct during contract performance includes: (i) a wanton lack of
MTA management and administration; (ii) deliberate acts and omissions by the MTA; (iii) an
extraordinary volume of design errors and omissions, changes, delays, disruptions, and other
impacts caused by the MTA across the ESA Program, and (iv) the MTA's response (or lack
thereof) to those problems.

3.      As a result of the MTA's intentional or indifferent conduct, disputes have arisen between Plaintiffs and the MTA concerning Plaintiffs' claims for compensation on the ESA Program ("Disputes").  However, Plaintiffs have been unable to resolve these Disputes due to a sham dispute resolution process, which the MTA has been implementing to deprive Plaintiffs of any true recourse.

4.      Specifically, all four contracts, which were drafted by the MTA, contain a dispute resolution process that gives an MTA employee unilateral authority to decide disputes that arise between Plaintiffs and the MTA (the "Dispute Resolution Process"), subject only to limited judicial review.

5.      The Dispute Resolution Process also permits *ex parte* communications and information sharing between MTA employees charged with deciding disputes with contractors, and other MTA employees, attorneys and executives.

6.      Moreover, the contracts circumscribe Plaintiffs' ability to seek judicial review of such decisions by, *inter alia*, altering the applicable standard of review and limiting the evidence that may be submitted to the reviewing court.

7.      In addition to the structural deficiencies in the Dispute Resolution Process, the MTA has abused the Dispute Resolution Process in bad faith.  The MTA has repeatedly subverted and frustrated the sham Dispute Resolution Process through its bad faith conduct, and the MTA employees have been unfair and unfaithful to their obligations to impartially decide disputes, as detailed below.

8.      As detailed herein, the MTA has intentionally subverted the Dispute Resolution Process in the Contracts by engaging in bad faith conduct, which was designed to coerce Plaintiffs into accepting MTA proposals to resolve legitimate Disputes that are tens of millions of dollars

less than the fair value of the work and services performed, and to deprive Plaintiffs of their rights to a process to resolve the Disputes, ultimately depriving Plaintiffs of contractual and legal benefits to which they are rightfully entitled.

9.      In other words, Plaintiffs are stuck without recourse.  The MTA's bad faith conduct on the ESA Program has caused Plaintiffs to incur over $330 million in damages.  Plaintiffs cannot get these Disputes resolved because the Dispute Resolution Process gives the MTA authority over the disputes and precludes any meaningful judicial review.  The MTA knows this, and so it has been intentionally subverting the sham dispute resolution process to force Plaintiffs into accepting cents on the dollar for the more than $330 million owed to Plaintiffs for work performed and extra costs incurred to correct the MTA's many errors and omissions on the ESA Program, including the MTA's known and acknowledged failure to honor its fundamental obligation to provide complete and properly coordinated design documents for the ESA Program and its colossal mismanagement of the program, which the MTA has publicly admitted on numerous occasions.

10.      The MTA laid bare its plans during a November 19, 2024 meeting between TPC executives Ronald Tutor and Jack Frost, MTA President Jamie Torres-Springer, with respective counsel for both parties.

11.      The MTA threatened that if Plaintiffs did not resolve their pending claims under the Contracts totaling $330 million – for $55 million – they would receive much less from an MTA employee who would later decide their claims under the MTA's Dispute Resolution Process, irrespective of merit.

12.      This offer was $11 million dollars less than an independent Dispute Review Board ("DRB") had already found Plaintiffs were entitled to on just one of the Contracts – CM006 – on which the DRB found entitlement and recommended $66,245,837 in damages (which an MTA

employee then almost entirely rejected under the next step in the sham Dispute Resolution Process, as discussed further below).

13.    The MTA has acted in bad faith by, among other acts and omissions: (1) pre-determining the outcome of Disputes; (2) dictating the outcome of Disputes to MTA employees responsible for rendering final determinations of those Disputes regardless of the merits; (3) failing to cooperate in good faith with the Dispute Resolution Process; (4) engaging in an intentional effort to manipulate the results of the Dispute Resolution Process; (5) failing or refusing to act on Plaintiffs' reasonable requests for equitable adjustment and claims for compensation, thereby precluding Plaintiffs from even availing themselves of the Dispute Resolution Process; (6) failing or refusing to compensate Plaintiffs for damages caused by a knowingly defective program design; (7) extra-contractually conditioning Plaintiffs' compensation for direct costs on Plaintiffs' waiver of associated impact costs, despite Plaintiffs' contractual entitlement to recover both; (8) repeatedly taking positions that defy logic, the project record, the plain language of the parties' agreements and New York law; (9) otherwise improperly administering the Dispute Resolution Process; and (10) depriving claimants of recourse against their government through a Dispute Resolution Process the MTA knows or should know is procedurally deficient.

14.    The sham Dispute Resolution Process, therefore, insulates the MTA's final determinations from a fair and meaningful judicial review, guaranteeing they are unassailable, while the MTA acts in bad faith in addressing Plaintiffs' claims and brazenly tells the Plaintiffs to accept millions below the fair value they are entitled to recover or "try their luck" under a dispute process it knows and has acknowledged is unjust and unfair.

15.    Upon information and belief, and because the Dispute Resolution Process created and administered by the MTA has limited oversight or judicial review by creation, no final

determination issued by an MTA employee on an MTA construction project has ever been overturned on judicial review.

16.     Plaintiffs seek to recover damages in an amount to be proven at trial, but believed to exceed $330 million, including for the MTA's breach of the implied covenant of good faith and fair dealing through its repeated misconduct and mistreatment of Plaintiffs in connection with the ESA Program.  Alternatively, Plaintiffs seek a declaratory judgment that the Dispute Resolution Process is illusory and unenforceable.  Plaintiffs also seek to recover damages for the MTA's breaches of contract.  The MTA's conduct also violates Plaintiffs' procedural due process rights, the prohibition on unlawful takings, and interferes with Plaintiffs' right to seek redress, all in violation of the United States Constitution and New York State Constitution. Finally, the MTA's mismanagement, design errors, omissions, delays and disruptions so fundamentally altered the ESA Program contracts that they constitute a cardinal change, entitling Plaintiffs to recover in quantum meruit.

## THE PARTIES

17.     Plaintiff Tutor Perini Corporation is a Massachusetts corporation with its principal place of business located at 15901 Olden Street, Sylmar, California 91342.

18.     Plaintiff Frontier-Kemper Constructors, Inc. is an Indiana corporation with its principal place of business located at 15900 Olden Street, Sylmar, California 91342. FKC is a wholly owned subsidiary of TPC.

19.     The MTA is a New York public benefit corporation with a principal place of business in New York, New York.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendant, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

21.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. §§ 1983 and 1988, and under the United States Constitution.

22.     The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the legal and equitable powers of this Court.

23.     This Court has supplemental jurisdiction over claims arising out of state law pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the federal claims and form part of the same case or controversy.

24.     This Court has personal jurisdiction over the MTA because its contacts with New York are sufficient such that exercising jurisdiction over it would not offend traditional notions of fair play and substantial justice.  The MTA has the responsibility for developing and implementing a unified mass transportation policy for The City of New York and its surrounding counties.

25.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because the MTA resides in the district and a substantial part of the events giving rise to Plaintiffs' claims occurred there.

## FACTUAL ALLEGATIONS

### I.     The MTA ESA Program

26.     The ESA Program is one of the largest capital projects in the history of the MTA. The program includes 40 miles of new tracks, a terminal beneath Grand Central Station ("GCT"), and the modernization of the most active intersection of passenger train lines in North America. Tunnel construction on the program began in 2007.

27.     Although the ESA Program can trace its roots back to regional planning proposals from the 1950s, the MTA began planning the modern ESA Program in earnest in the mid-1990s.

28.     These plans originally contemplated that the ESA Program would be comprised of just a few massive contracts with multi-faceted scopes of work, lessening the level of coordination required of the MTA between contracts.

29.     In a misguided attempt at cutting costs, however, prior to putting the work out for bid in the mid-2000s, the MTA decided to split the contracts into multiple narrower contracts, without regard for how each would be coordinated with the others in terms of constructability, design, and overall administration.

30.     Current MTA Chief Executive Officer ("CEO") Janno Lieber identified the root cause of the problem during an MTA Board Meeting on September 23, 2020, in which he explained that:

> *the ESA Program has devolved into hand-to-hand combat dealing with dozens of separate and frequently conflicting contracts from the pre-design/build method when the strategy was to break big projects into many separate contracts.*

31.     The MTA was never able to overcome this fundamental flaw in the way the Contracts were put out for bid, resulting in tremendously increased cost and schedule implications for the ESA Program, which have been inequitably borne by the Plaintiffs.

32.     Moreover, the entire ESA Program has been severely impacted by an unprecedented number of MTA-caused design changes, obstacles, delays, disruptions, a wholesale lack of coordination by the MTA and its consultants, sustained MTA administrative incompetence and subversion of the contractual Dispute Resolution Process.

33.     Plaintiffs have nevertheless worked in very difficult circumstances, underground for over a decade[1] to overcome these MTA-caused failures and deliver a world-class infrastructure project for residents of the New York Metropolitan area and visitors from around the world.

## II.     The Contracts

### A.     The "Contracts"

34.     Plaintiffs TPC and its subsidiary FKC are parties to four contracts with the MTA on the ESA Program that are at issue in this action – CM006, CM007, CS179 and CQ032 (the "Contracts") – with a total initial value of over $1.9 billion, collectively.

35.     CM006 included the installation by FKC of permanent structural concrete lining, fit-outs and duct bench within the entire program tunnel system, caverns, and interior structures between Long Island City, Queens and Grand Central Station.

36.     CM007 included the construction by TPC of the Grand Central Terminal Station Caverns and installation of the track and special track work in the twelve-mile tunnel system and GCT Caverns.

37.     CS179 included the installation and testing by TPC of electrical, communication, control, security, fire, power, metering, switchgear, signaling, lighting and HVAC systems and equipment throughout the tunnel system and Grand Central Station.

---

[1] On the CS179 project alone, TPC worked underground for five years more than the original contract duration.

38.     CQ032 included the construction by TPC of temporary power, tunnel ventilation, tunnel drainage, water supply, lighting, dewatering systems, guiderails, handrails, and fencing for the program and the rehabilitation and modification of five railroad facilities, construction of power manholes, below-grade interlocking structures, pump rooms, ventilation shafts, and associated switchgear equipment.

39.     The MTA recognized in formal modifications during the course of the ESA Program that TPC and FKC were performing the Contracts as "one TPC," and enabled TPC to transfer scopes of work between the Contracts where necessary to efficiently perform the work, avoid conflicts and achieve substantial performance of each of the Contracts.

40.     As set forth below, each of the Plaintiffs' Contracts on the ESA Program was severely impacted by an unprecedented number of MTA-caused design changes, obstacles, delays, disruptions, and coordination failures by the MTA, all of which were compounded by egregious MTA misconduct and bad faith.

41.     Rather than dealing fairly in the resolution of these issues, however, the MTA compounded its error by consistently acting in bad faith and with wanton disregard of its own contractual and legal obligations to Plaintiffs.

42.     On January 12, 2023, at an "opening ceremony" to open the ESA Program to the public (a ceremony that was held notwithstanding that Plaintiffs were still performing on the ESA Program), Mr. Lieber publicly acknowledged that when he took over MTA Construction & Design in July 2021, the ESA Program was a "hot mess."

43.     To get the ESA Program back on track, Mr. Lieber led an effort in which the MTA "tore the project apart and put it back together" with the goal of "no more schedule slippages."

This involved taking an overall program schedule that had 8,000 discrete tasks and converting it into one with 45,000 discrete tasks.

44.     These scheduling measures were completely one-sided to benefit the MTA, at the expense of those actually conducting the work on the ESA Program.  The ESA Program schedule was accelerated through a stream of MTA demands to address issues Plaintiffs played no part in creating, while the MTA ignored its own contractual commitments, accountability, and schedule obligations to Plaintiffs.

45.     The path to completion devolved into daily, and sometimes twice daily, meetings between the MTA and its contractors, including Plaintiffs, to schedule work in areas where the MTA deemed it most beneficial to the ESA Program, without regard to Plaintiffs' plans and budget for completing its work.

46.     The MTA's administration of the ESA Program caused major disruptions to the schedule and effectively eliminated Plaintiffs ability to progress work in a sequential, efficient, and cost-effective manner.

**B.     The MTA's Sham Dispute Resolution Process**

47.     Pursuant to each of the Contracts, Plaintiffs have the right to compensation for changes and associated disruptions to their work under Article 8.04(B)(6) of the Contracts' General Terms and Conditions.

48.     The Contracts provide processes by which contractors can submit Requests for Equitable Adjustments ("REAs") and Notices of Claims ("NOCs").

49.     Article 8.04(B)(6) of the General Terms and Conditions is entitled "EQUITABLE ADJUSTMENTS IN PRICE," and provides that Plaintiffs "shall" be entitled to an equitable

adjustment in price for "other Work necessarily affected by [] Change[s] as well as the reasonable increased and decreased direct costs resulting from the actual Change Work."

50.    Article 12.01(B) of the General Terms and Conditions provides that "Except for claims for equitable adjustment in Contract Price or Time . . . if the Contractor claims or intends to claim compensation for any other damage or loss sustained by reason of any act, neglect, fault or default of the MTA, arising out of or relating to this Contract or the Work, the Contractor shall furnish a written Notice of Claim to the MTA Authorized Representative setting forth the nature of the claim and the extent of the damage sustained[.]"

51.    The Dispute Resolution Process under the MTA Contract General Terms and Conditions affords the MTA unfettered discretion to reject Plaintiffs' REAs and NOCs, and deprives Plaintiffs of the opportunity to discover or present evidence of the MTA's bad faith, misconduct, and subversion of the Dispute Resolution Process.

52.    Article 12 of the General Terms and Conditions outlines the original Dispute Resolution Process, which applies to Contract CM006.

53.    As a first step, the contractor must submit disputes ("Disputes") to a DRB comprised of construction industry neutrals. The DRB then issues "non-binding findings and recommendations."

54.    Thereafter, the DRB's findings and recommendations are submitted to the MTA Program Executive, an MTA employee, to accept or reject the DRB's findings and recommendations. The Program Executive's determination can be appealed to the Chief Engineer, another MTA employee.

55.    The decision of the Chief Engineer is subject only to the "limited judicial review," which purports to be pursuant to Article 78 of the New York Civil Practice Law and Rules

("CPLR"), of "whether the determination by MTA was arbitrary, capricious or an abuse of discretion." This limited judicial review, however, purports to exclude the "supported by substantial evidence" standard of review set forth in Article 78, and is limited to the question of whether the determination by the MTA employee was arbitrary, capricious or an abuse of discretion. Thus, this review does not even mirror the actual Article 78 standard because it purports to eliminate one way in which a court may overturn a decision under Article 78.

56.     Importantly, the MTA employees who make these determinations are not neutral, impartial, or insulated from the Contracts. To the contrary, the Contracts expressly recognize that these individuals both advocate on behalf of the MTA in settlement negotiations and serve as decision-makers with respect to disputes.

57.     In addition, the Contracts authorize the Program Executive and Chief Engineer to engage in independent fact-finding, allowing them to consider "available documents and evidence" other than what is submitted by the parties, and to conduct *ex parte* communications. The Contracts, however, prohibit *ex parte* communications with the DRB. As such, the MTA employees with ultimate authority to render a Final Decision are permitted to engage in *ex parte* communications with other MTA employees, executives, and attorneys concerning their decision, despite the Contracts recognizing the risk presented by *ex parte* communications to the fair disposition of a dispute by prohibiting such communications with the DRB.

58.     Finally, as noted above, the Contracts provide for circumscribed judicial review:

> Any MTA Final Decision with respect to a Dispute initiated pursuant to ARTICLE 12.02 - commencement of disputes, Application of disputes resolution procedures, shall be subject to review solely in the form of a challenge following the Final Decision , in a Court of competent jurisdiction of the State of New York, County of New York, under Article 78 of the New York Civil Practice Law and Rules or a United States Court located in New York City, under the procedures and laws applicable in that court.

> Said review of the Court shall be limited to the question of whether the determination by MTA was **arbitrary, capricious or an abuse of discretion**. **No evidence or information shall be introduced or relied upon in such proceeding which has not been duly presented to the Chief Engineer, the Program Executive or Disputes Review Board** in accordance with ARTICLES 12.02, 12.03 and 12.04. (emphasis added).

59.    Thus, while the Program Executive and Chief Engineer are not limited to the evidence presented to them by the parties in rendering their decision, including information they may obtain via *ex parte* communications with other MTA employees, executives and attorneys, only the evidence that is formally presented to the Project Executive and Chief Engineer can be considered by a court in determining whether the Final Decision was arbitrary, capricious or an abuse of discretion.

60.    Unlike the CM006 Contract, the other Contracts were modified by Article 12 of the MTA's Supplemental Terms and Conditions, which render the Dispute Resolution Process even more one-sided in favor of the MTA, because the modified process eliminates the independent DRB and affords unilateral discretion exclusively to MTA employees to decide disputes while retaining their ability to engage in *ex parte* communications with other MTA employees and attorneys, and gather and rely on information beyond what is formally submitted by the parties to render their decisions.

61.    Article 12 of the Supplemental Terms and Conditions provides that disputes are first submitted to the Program Executive, an MTA employee, whose decision is final and binding absent further appeal.

62.    The Program Executive's decision can either be appealed to the Chief Engineer, another MTA employee, solely for technical disputes relating to the interpretation of plans and specifications, or the MTA's Contractual Dispute Resolution Board ("CDRB"), which is

comprised of a single MTA lawyer, with no required experience in construction or construction related issues, for all other disputes including those at issue in this action. The decision of the Chief Engineer or CDRB is again subject only to the "limited judicial review" of "whether the determination by MTA was arbitrary, capricious or an abuse of discretion."

63.     The Dispute Resolution Process in all of the Contracts between Plaintiffs and the MTA is patently one-sided and illusory.

64.     Upon information and belief, no final determination issued by an MTA employee on an MTA construction project has ever been overturned on judicial review under the Dispute Resolution Process at issue in this action.

65.     The MTA is keenly aware of the unfairness of its dispute resolution provision. At an MTA webinar on September 30, 2020, Mr. Lieber, CEO of the MTA stated:

> So the first thing we want to do is to make the MTA a much better client or customer, so contractors and consultants won't add an MTA premium. So, you know we've attacked very aggressively the provisions of MTA contracts that make us different than others and a little one-sided, like the dispute resolution provision that basically says the MTA gets to decide any dispute between the MTA and a contractor, *that's not fair*, and they charge you for it. (emphasis added).

66.     The MTA has since removed the unfair Dispute Resolution Process from its current contract documents and replaced it with binding arbitration before a neutral decision maker.[2]

C.     **The MTA Applied Its Sham Dispute Resolution Process in Bad Faith**

67.     Notwithstanding the fact that the Dispute Resolution Process is inherently illusory and sham, Plaintiffs entered into the Contracts with the reasonable expectation that the MTA would administer the Dispute Resolution Process fairly and in good faith.

---

[2] TPC has requested that the MTA apply this revised neutral and objective dispute process to the ESA Program claims at issue in this action, but the MTA has refused to do so.

68.    The MTA has instead abused its discretion, acted in bad faith and intentionally subverted the Dispute Resolution Process, which has left Plaintiffs without effective recourse for their hundreds of millions of dollars in combined damages.

69.    In this sham Dispute Resolution Process, MTA employees disregard contract terms, evidence, and New York law by pre-determining the outcomes of disputes and deciding them in favor of the MTA irrespective of the merits.

70.    At every opportunity the MTA has used the Dispute Resolution Process to threaten and bully Plaintiffs on the ESA Program.  The MTA has also sought to leverage its unilateral control over the Dispute Resolution Process by forcing Plaintiffs to relinquish claims and other contractual rights, including strong-arming Plaintiffs into taking cents on the dollar and relinquishing their rights to impact costs to secure payment for direct costs to which they are indisputably entitled.

71.    In other instances, the MTA has frustrated the Dispute Resolution Process by refusing to act on change order proposals in an effort to effectively deny Plaintiffs any redress. For example, Plaintiffs' COVID-19 Impact Costs claims have been pending for years.  These claims were submitted in response to the MTA's requests for change proposals to provide compensation for the tremendous costs incurred due to the continuation of Plaintiffs' work under severely restrictive COVID-19 mandates and protocols.

**D.    Contract CM006**

72.    The inherent structural defects in the Dispute Resolution Process and the MTA's bad faith misconduct in subverting the Dispute Resolution Process were both egregiously displayed on Contract CM006.

73.    CM006 was held by TPC's wholly owned subsidiary FKC. The MTA issued Notice to Proceed with the work to FKC on March 31, 2014.

74.    On or about April 1, 2016, FKC and the MTA executed Modification No. 24 ("Mod 24") to Contract CM006 for the ESA Program tunnel work, which allowed TPC and FKC to treat CM006, CM007, CS179 and CQ032 as one contract for purposes of performing the work.

75.    This included enabling Plaintiffs to request to transfer certain scopes of work from CM006 to the later TPC CM007 and CS179 Contracts where necessary to efficiently perform the work, avoid conflicts and achieve substantial completion of the Contract.

76.    The MTA acknowledged that Mod 24 was intended to create "one TPC" for the purposes of the ESA Program moving forward.

77.    On April 24, 2017, FKC submitted an approximately $60 million Request for Equitable Adjustment ("REA") for impacts sustained on the project due to MTA changes, delays and mismanagement ("CM006 REA").

78.    On or about May 16, 2017, in response to FKC's request for scope transfers to another TPC contract in connection with Mod 24 to facilitate substantial completion, the MTA Project Manager for CM006, Judith Kunoff stated in an email to FKC that: "In response to the CM006 [FKC] equitable adjustment/potential $60M claim, ESA will determine what scope will be chosen to move out of 006 and into a later TPC contract at our discretion, which by contract is our prerogative."

79.    The next day, Ms. Kunoff confirmed: "we are not willing to consider scope transfers for the benefit of TPC until you are ready to discuss withdrawal of what we consider to be a baseless claim."

80.     When FKC did not yield to this extra-contractual demand and withdraw its claim, the MTA followed through on its threat and denied FKC's request for reasonable scope transfers, which became the subject of a Dispute submitted to the DRB.

81.     The DRB was comprised of: Robert Rubin, P.E., Esq., a preeminent and nationally renowned New York construction lawyer and co-author of the New York Construction Law Manual; Glen Stevens, P.E., a claims consultant with extensive experience on large civil works projects across the country, including the $14 billion "Big Dig" in Boston, Massachusetts; and Joseph Keating, the CEO and founder of a national construction company.

82.     After a full hearing, the DRB concluded that "FKC *did* have the right to transfer the disputed Scope Transfer items to another contract held by a related corporate entity." (emphasis in original).

83.     However, the DRB went on to state that:

> FKC was fully within its rights under the contract to have asserted the $60M AWR [*Additional Work Request*]. Likewise, the contract provides the MTA rights and remedies to deal with FKC's $60M AWR. The MTA's action in making FKC's withdrawal of the $60M AWR a condition to approving the disputed Scope Transfer items can be viewed from at least two perspectives. From a construction business point of view, it can be considered to have been done in a calculated manner in order, for negotiation purposes, to attempt to leverage their position to resolve what the MTA saw as an un-meritorious claim. That is hard-ball negotiations. On the other hand, from a strictly legal point of view, it may be considered to have been wrongful and coercive, <u>likely exceeding an arbitrary and capricious standard</u>." (emphasis added).

84.     Following this rebuke of the MTA, the parties settled the scope transfer dispute pursuant to an executed bilateral modification.    In that settlement, Plaintiffs reserved the right to pursue the REA.

85. Plaintiffs attempted to negotiate a reasonable resolution, but that attempt failed. The parties found themselves back in front of the DRB on the CM006 REA that Ms. Kunoff had attempted to wrongfully coerce FKC into abandoning.

86. The DRB spent more than 4.5 years reviewing over 1,000 pages of written briefs and responses, 600 exhibits and numerous excel files and damage computations in connection with the CM006 REA.

87. The DRB also conducted several weeks of hearings involving testimony from multiple witnesses and experts, and the presentation of approximately 2,300 power point slides and associated evidence from the project record.

88. At the end of this process, the DRB found against the MTA, and in favor of FKC's claims on the merits and recommended damages in the sum of $41,035,351 and interest of $25,210,486, for a total award of $66,245,837. The DRB's rationale was articulated in three sets of detailed written findings and recommendations.

89. Pursuant to Contract CM006, the DRB findings and recommendations were then submitted to the Program Executive for acceptance or rejection.

90. By this time, the CM006 Project Manager, Judith Kunoff, had been elevated by the MTA to the Program Executive charged with accepting or rejecting the DRB's findings and recommendations under the MTA's sham dispute process.

91. Ms. Kunoff is the same individual who had called the CM006 REA "baseless" and attempted to wrongfully strong-arm FKC into dropping the claim when she was the CM006 Project Manager five years earlier.

92. Although Ms. Kunoff did not attend the DRB hearings and had access to the voluminous record for only a matter of weeks, she promptly rendered a decision on January 17,

2025 (the "Decision"). Ms. Kunoff rejected 98% of the damages awarded by the DRB and decided FKC's claims as follows:

| Item of Damages | DRB Award | Program Executive Award |
|---|---|---|
| 52nd Street Change House | $9,438,147 | $0 |
| Extended Locomotive Operations | $169,964 | $0 |
| Extended Maintenance Operations | $2,905,381 | $0 |
| Direct Costs | $897,994 | $850,660 |
| Cumulative Cost Impact Before 6/3/17 | $18,047,039 | $0 |
| Cumulative Cost Impact After 6/3/17 | $5,170,645 | $0 |
| Subcontractor Claims | $1,447,134 | $0 |
| Interest on Retainage | $2,959,046 | $0 |
| Interest on Damages | $25,210,486 | $0 |
| **Total** | **$66,245,837** | **$850,660** |

93.     The Decision largely parrots the erroneous factual and incorrect legal arguments made by the MTA during the DRB proceedings, which the DRB rejected as meritless.

94.     The Decision also references witness testimony at the hearings, which Ms. Kunoff did not attend.  Not once did Ms. Kunoff contact a representative of FKC during her purported deliberations on the DRB's findings and recommendations.  She obviously was in contact with MTA representatives as the DRB proceedings were not recorded or transcribed and there could be no other source for the statements she attributed to MTA witnesses.

95.     Ms. Kunoff is patently biased given her well-documented history of bad faith conduct, abuse of discretion, and outward hostility toward FKC and the CM006 REA itself.

96.     On January 28, 2025, FKC appealed the Decision by Ms. Kunoff to the Chief Engineer of the MTA, Matthew Best, P.E., pursuant to Article 12.03(C) of the CM006 General Terms and Conditions, which permits an appeal "[i]f the Program Executive's Decision is contrary to the DRB's Findings and Recommendations in whole or part[.]"

97.     Pursuant to Article 12.03(C)(3) of the CM006 General Terms and Conditions, Mr. Best was to render his decision within thirty (30) days of the appeal, or to notify the parties in writing of the date on which his decision would be rendered.

98.     Mr. Best extended the thirty (30) day period to April 14, 2025 and then to May 14, 2025 due to what he stated was "the complexity of the matter."   On May 15, 2025, after no decision had been received by Mr. Best, FKC emailed Mr. Best and the parties to inquire as to the status. Mr. Best responded five and a half hours later with a "Final Decision" that affirmed the Program Executive's Decision in its entirety and adopted all of her findings without any indication of an independent review or analysis (the "Chief Engineer Decision").

99.     The Chief Engineer Decision merely rubber stamps the Decision by Ms. Kunoff.  It contains no substantive analysis and spends only a few paragraphs discussing concepts that were the subject of hundreds of pages of briefing, thousands of pages of exhibits, and which the DRB spent weeks analyzing through multiple rounds of in-person hearings.

100.    The Chief Engineer Decision, like the underlying Decision, also concludes that the DRB did not follow New York law, despite neither the Chief Engineer nor the Program Executive being attorneys, and despite Robert Rubin, Esq., a pre-eminent New York construction attorney and the author of the New York Construction Law Manual, having been a member of the DRB and found no such violation.

101.    Upon information and belief, other MTA employees (besides Ms. Kunoff and Mr. Best) dictated the outcome of the Decision and the Chief Engineer Decision, and/or participated in drafting the Decision and the Chief Engineer Decision, while concealing the same from FKC.

102.    The MTA engaged in this sham process to provide the illusion of a fair dispute resolution process.

103.    FKC complied with the Dispute Resolution Process pursuant to Article 12 of CM006 and expected a fair and just outcome, which it did not receive.

104.    FKC's recourse under the Dispute Resolution Process is a challenge to the Decision under an arbitrary and capricious standard, ostensibly without regard to the substantial evidence submitted during the hearings, which the MTA stripped from its dispute resolution provision.

**E.    Contract CM007**

105.    CM007 included the construction by TPC of the Grand Central Terminal Station Caverns and installation of the track and special track work in the twelve-mile tunnel system and GCT Caverns.

106.    The original contract performance duration for the CM007 project was 1,521 days or approximately four years and one month.  Due to the MTA's mismanagement and a massive number of design errors and omissions, this duration more than doubled to 3,168 days, or approximately eight years and six months.

107.    On 78 separate occasions, the MTA arbitrarily rejected TPC's valid and legitimate proposed change orders for extra work and associated schedule impacts.

108.    On October 30, 2020, TPC submitted a REA in the sum of $50 million based on various MTA management, coordination and design failures described therein ("CM007 REA").

109.    Prior to resolution by the MTA's Contractual Dispute Resolution Board ("CDRB"), which is comprised of a single MTA lawyer, with no required experience in construction or construction related issues, Contract CM007 requires mediation.  TPC duly requested mediation in connection with the CM007 REA.

110.    On December 13, 2024, the General Counsel for MTA Construction & Development advised TPC's counsel that if TPC pursued mediation on the CM007 REA, the MTA would assess liquidated damages for delays on CM007 in the sum of $29 million.

111.    This is another instance of the MTA's bad faith, leveraging its subversion of the Dispute Resolution Process in an effort to deprive TPC of its contractual rights.

112.    TPC did not withdraw the mediation request.    On January 17, 2025, the MTA notified TPC of its intent to assess liquidated damages in the sum of $29 million, and invited TPC to submit information relating to the assessment of liquidated damages by January 30, 2025.

113.    TPC timely responded to the offer and stated the reasons why the assessment of liquidated damages on the project would be wrongful, unjustified and unlawful.

114.    For example, the MTA made a massive number of changes on CM007, including changes made after the substantial completion date, without giving TPC any extension of time or revising the substantial completion date accordingly.    This precludes the MTA from assessing liquidated damages as a matter of well-settled New York law.

115.    Upon information and belief, the MTA prejudged the CM007 REA, and improperly threatened tens of millions of dollars in back charges against TPC if it does not forgo mediation and withdraw the CM007 REA.

116.    The MTA has frustrated the Dispute Resolution Process across the ESA Program by intentionally depriving Plaintiffs of their rights under the interrelated Contracts that comprise the ESA Program.

117.    The MTA has also frustrated the Dispute Resolution Process by failing and refusing to move forward with mediation and/or to otherwise act on the CM007 REA.

118.    As demonstrated on the CM006 Contract, any further participation in the Dispute Resolution Process overseen by MTA employees would be a sham.

**F.    The CQ032 Project**

119.    The CQ032 project included the construction by TPC of temporary power, tunnel ventilation, tunnel drainage, water supply, lighting, dewatering systems, guiderails, handrails, and fencing for the program and the rehabilitation and modification of five railroad facilities, construction of power manholes, below-grade interlocking structures, pump rooms, ventilation shafts, and associated switchgear equipment.

120.    The MTA is withholding $2,097,068 in contract payments on the CQ032 Contract from TPC for what it claims will be decades of future maintenance costs to address water leaks on the project site that were not caused by TPC and were present long before TPC began work on any portion of the project.

121.    As early as 2012, TPC met with the MTA to review areas surrounding the CQ032 scope of work where there was significant water leakage, no waterproofing and no design details to provide waterproofing.

122.    The MTA understood vast portions of the CQ032 structures that TPC was required to tie into (the Northern Boulevard Bracing Slab, Amtrak Bridge and Queens TBM Launch Block) had unresolved water infiltration issues and no waterproofing.

123.    On October 26, 2015, TPC submitted a letter with 47 pages of drawings that set forth in great detail: (i) each and every area where no waterproofing was provided or designed by the MTA; and (ii) areas where an insufficient design effort by the MTA was channeling ground water into TPC's work area.

124.    The MTA subsequently issued four contract modifications to TPC in the total sum of $7,641,972 to address and remediate water infiltration issues on the project, which have continued from the day TPC arrived on site to the present.  These modifications confirm that the MTA knew full well that: (i) TPC was not responsible for the water infiltration; (ii) the need to perform the waterproofing work to contain it; and (iii) the waterproofing work was "extra work" outside the scope of TPC's CQ032 Contract.

125.    TPC received payment for the contract modifications, but has an additional $2,934,035 in unfunded water remediation costs for which it is entitled to reimbursement.

126.    The MTA is now withholding TPC's contract balance in the sum of $2,097,068 for what it claims will be future maintenance costs to address the water leaks that never subsided.

127.    The MTA has recognized that the site was inundated with water leaks before and during TPC's work on the project.  The MTA terminated a prior contractor who performed work on the project site and hired a replacement contractor to repair leaks on the site prior to the award of the CQ032 Contract to TPC.

128.    The withholding of contract payments on the ground that further leaks may eventually need to be remediated is an unfair, unwarranted, and unconscionable breach of contract.

129.    Upon information and belief, the MTA has prejudged TPC's claim for its contract balance, and attempted to assert that TPC is liable for leaks that it knows TPC did not cause.

130.    Given the manner in which the Dispute Resolution Process was conducted by the MTA on Contracts CM006 and CM007, the application of the same process on this dispute would be a sham.

**G.    Contract CS179**

131.    Contract CS179 included installation and testing by TPC of electrical, communication, control, security, fire, power, metering, switchgear, signaling, lighting and HVAC systems and equipment throughout the tunnel system and Grand Central Station.

132.    The original contract performance duration for the project was 2,065 days or approximately 5 years and 6 months.  Due to the MTA's mismanagement and a massive number of design errors and omissions this duration more than doubled to 4,140 days, or approximately 11 years and 3 months and is still underway.[3]

133.     On May 8, 2019, after an incredible number of design changes, disruptions, and schedule impacts on the project, TPC and the MTA executed Modification No. 197 ("Mod 197"), which increased Contract CS179's price by $67 million.

134.    This amount included $23 million in payments for prior impacts to TPC's work and $44 million in payments tied to schedule milestones for acceleration costs and changed conditions.

135.    The milestone payments were conditioned on the MTA lifting certain defined access restraints and meeting specific commitments to enable TPC to achieve a revised project schedule and Substantial Completion date of June 30, 2021.

136.    The MTA represented during negotiations that any further changes would be de minimis and that TPC would have a clear path to achieving its milestones.

137.    This representation proved demonstrably false, and through no fault of TPC, design changes, disruptions, and associated project impacts continued with even more frequency than before the execution of Mod 197.

138.    For example, since the execution of Mod 197, the MTA issued 571 change proposal requests ("CPRs") for design revisions and changed work, 721 bilateral modifications for over

---

[3] Despite numerous requests, the MTA still cannot provide TPC with a schedule for the required access to the site for final completion of the project to confirm this end date.

$216 million in additional work, and 16 unilateral modifications for millions more in additional work, while missing 58 of the 81 specific commitments it made in the modification.

139.    On several occasions, TPC notified the MTA of its failure to honor the majority of the commitments it made under Mod 197 and of TPC's increased costs of performance resulting from the missed commitments.  These notifications were met with increasing hostility and bad faith conduct by the MTA.

140.    On May 28, 2021, the MTA unexpectedly and unilaterally issued Instructions for Live Rail Access to TPC, which called for the energization of third rail and train movement within the right of way while work on the project remained far from complete.

141.    Under the terms of the CS179 Contract, this energization and running of trains was not supposed to have occurred before substantial completion of the project, which was years away.

142.    The MTA did not provide TPC with a Change Proposal Request for this major change to the work conditions on site, which had severe financial consequences on the planned schedule and sequencing of the work.

143.    The MTA then executed a contract with a separate contractor, RailPros, to implement the MTA testing and commissioning of the trains without any adjustment to TPC's contract price despite the severe consequences of being required to perform construction operations in miles of tunnels during live rail operations.

144.    TPC duly notified the MTA of the substantial cost impacts and its expectation for payment.

145.    In September 2022, Mr. Lieber, the MTA CEO, called the project management teams of each ESA Program contractor, including TPC, to a Friday afternoon meeting where he requested that they put aside "commercial issues" for now and give their personal commitment to

open the project to the public by the end of the year.  In return, Mr. Lieber gave his assurance to TPC's representatives that TPC would be treated fairly on its pending REA ("CS179 REA") submitted per the Contract for TPC's massively increased costs of construction after the MTA issued Mod 197.

146.    After giving this personal assurance, Mr. Lieber did not appear or participate in any of the ensuing negotiations on the resolution of TPC's CS179 REA despite several requests by TPC executives for him to do so.

147.    On December 31, 2022, the MTA declared the ESA Program substantially complete, even though the project was far from that milestone, and on January 25, 2023, the MTA opened the CS179 work site to the public for full rail operations and revenue service.

148.    The MTA's declaration of substantial completion was in bad faith, constituted an abuse of its discretion, and was knowingly premature and improper.

149.    Upon information and belief, the MTA declared substantial completion because of, and in furtherance of, the MTA's subversion of the Dispute Resolution Process, believing that it was immune from any meaningful recourse by TPC.

150.    This premature declaration of substantial completion by the MTA forced TPC to:

   a.    incur massive extended performance costs;

   b.    complete its work in a live, fully occupied, and operational railroad environment for years, which was neither required under nor contemplated by the CS179 Contract;

   c.    coordinate and schedule its work on a daily and weekly basis subject to the availability of: (i) the few work areas that were not impacted by the traveling public and railroad operations; (ii) many different departments of the MTA and Long Island Railroad ("LIRR") with conflicting work hours and limited workdays; (iii) MTA and LIRR resources such as flaggers, which were often not available or late; and (iv) track outages, which are typically only granted between 2am and 5am;

    d.       perform much of the work during overtime which, in turn, required additional supervision that would not have been necessary if TPC been permitted to perform the work during straight time hours; and

    e.       "own" the risk of loss for all equipment, materials and installations for an extended period under the CS179 Contract until the MTA obtained beneficial occupancy of the *entire* site.

151.    Moreover, pursuant to Article 6.03(A)(5) of the Contract General Conditions, the MTA was entitled to issue only one punch list of "minor incomplete or unsatisfactory items" upon declaring Substantial Completion.

152.    Instead, the MTA issued multiple punch lists, including vast areas of base contract work that were not minor and which remained incomplete due to continuing MTA delays, design changes and access restraints.

153.    The multiple punch lists caused the need for repeated and unnecessary MTA inspections and prevented TPC from achieving Final Completion.

154.    In addition, by prematurely declaring substantial completion in bad faith, the MTA sought to manufacture contractual and legal bars to TPC claiming extended performance costs after the MTA had declared substantial completion.

155.    On January 15, 2021, TPC submitted the CS179 REA in the amount of $83 million for the post-Mod 197 changes and impacts it had encountered.

156.    Beginning in November 2022, the MTA and TPC held weekly and bi-weekly negotiation sessions on the CS179 REA, during which TPC provided ample support for its claims (far more than was required during the negotiation of Mod 197).

157.    In response, and contrary to the negotiations leading up to the execution of Mod 197, which did not even approach the extent of the changes and disruptions experienced by TPC after that modification, the MTA was neither fair nor equitable and would agree to pay only "cents

on the dollar" for discrete portions of the CS179 REA. The MTA refused to address the CS79 REA as a whole or consider, much less negotiate, the impacts to the costs of TPC's work as a result of the massive number of changes even though the contract expressly allows for the recovery of such impacts and the MTA previously funded such impact costs under Mod 197.

158.    On August 16, 2024, after nearly two years of monthly negotiation sessions, the MTA proposed a payment of $55 million, not to settle TPC's CS179 REA, but to settle and close out all four of TPC's open contract receivables on the ESA Program totaling in excess of $330 million (CS179, CM006, CM007 and CQ032).

159.    The offer was presented to TPC and FKC as a "take it or leave it" proposition, notwithstanding the fact that the independent DRB found that FKC had proven more than $66 million in damages on Contract CM006 alone.

160.    On November 19, 2024, TPC executives, Ronald Tutor and Jack Frost, and TPC's legal counsel met with MTA President Jamie Torres-Springer and the MTA C&D's General Counsel to discuss the MTA's proposal and to attempt to reach a fair and reasonable resolution.

161.    At this meeting, the MTA's plot to force Plaintiffs to relinquish their contractual rights on all Contracts by leveraging the sham Dispute Resolution Process was revealed.

162.    The MTA's General Counsel threatened that if the $55 million proposal was not accepted, all disputes would be administered through the MTA's Dispute Resolution Process and stated that in such event, TPC would receive much less than what the MTA was proposing.

163.    The MTA's President then erroneously stated that the DRB's $66 million finding in favor of FKC on Contract CM006 was baseless and the General Counsel erroneously stated that it did not comply with New York law. Neither of these individuals attended a single one of the many days of DRB hearings.

164.    In fact, at the time the MTA President made these statements, the DRB's Findings and Recommendations had not even been submitted to the MTA's Program Executive, Ms. Kunoff, for review and a decision under the MTA's sham Dispute Resolution Process.  The statements by the General Counsel and President proved prescient as they were reflected almost verbatim in Ms. Kunoff's Decision two months later.

165.    Rather than engage in a fair and equitable discussion to resolve the pending issues individually under each contract and in good faith, the MTA representatives sought to leverage the unfair Dispute Resolution Process to coerce a settlement and deprive Plaintiffs of their contractual rights.

166.    The MTA refuses to address the Plaintiffs' legitimate claims on the merits and engages in bad faith conduct by subverting the Dispute Resolution Process, knowing full well that Plaintiffs cannot sufficiently challenge the final decisions rendered thereunder because the MTA employees determine the outcomes, the contract allows for *ex parte* communications with staff, and the contract restricts judicial review.

167.    TPC would not have even considered bidding and would not have in fact bid on the MTA's ESA Program Contracts if it had been told by the MTA that due to: (i) massive unresolved design and design coordination issues; (ii) unresolved coordination issues with the other rail agencies (i.e., Long Island Rail Road, New York City Fire Department, and Amtrak); (iii) the erroneous inclusion of obsolete and outdated equipment in the design documents; (iv) other large projects at 270 Park and elsewhere that were planned to coincide with TPC's work activities on the work site; (v) the MTA's severely dilapidated infrastructure, which TPC would be held responsible for; and (vi) work during live rail operations, the original contract duration of five and

a half years would double in duration with no hope of a fair and just resolution of the tremendous

costs that would be required to deliver the ESA program under these circumstances.

168.    All of the above events occurred on the ESA Program.  None of them were

disclosed to Plaintiffs when the Contracts were bid and the MTA's sham Dispute Resolution

Process will not provide just and fair relief.

### H.    Unresolved COVID-19 Costs

169.    On January 12, 2021, the MTA issued Change Proposal Request ("CPR") 344 to

TPC on Contract CS179 requesting pricing for costs and schedule impacts associated with the

COVID-19 Pandemic incurred or experienced as of January 6, 2021 ("COVID-19 Impact Costs").

CPR 344 stated that "the MTA is considering a modification to" Contract CS179 to compensate

TPC for such costs.

170.    TPC was encouraged by CPR 344 because of COVID-19's substantial and

devastating financial impact on TPC and its subcontractors, who steadfastly worked on the Project

through the pandemic under severe work restrictions and health and safety mandates.

171.    TPC submitted a change order proposal in response to the MTA's request on

February 9, 2021.  The proposal sought $17,408,040 for COVID-19 Impact Costs during the period

between March 17, 2020, through January 6, 2021.  COVID-19 Impact Costs continued well

beyond January 6, 2021, and TPC submitted additional proposals to bring its total COVID-19

Impact Costs request to approximately $37 million.

172.    Similarly, on January 12, 2021, the MTA issued CPR 113 to TPC on Contract

CM007 requesting pricing for COVID-19 Impact Costs.  Once again, the CPR stated that "the

MTA is considering a modification to" the CM007 Contract to compensate TPC for such costs.

173.    In response, TPC submitted a change order proposal in accordance for COVID-19 Impact Costs during the period between March 17, 2020, through January 6, 2021. COVID-19 Impact Costs continued well beyond January 6, 2021, and TPC submitted a supplemental change order proposal in May 2024 for $64,152,676.

174.    Without explanation, justification, or a specific rejection of TPC's COVID-19 change order proposals submitted in response to the MTA's requests for the same to compensate TPC for the obvious cost impacts of COVID-19 on the projects, the MTA has refused to even discuss, much less resolve, TPC's real and demonstrable COVID-19 Impact Costs.

175.    By failing to act on TPC's COVID-19 change order proposals and properly administer the Dispute Resolution Process, the MTA has frustrated TPC's access to the Dispute Resolution Process.

176.    This is despite Governor Kathy Hochul confirming in a public statement on March 7, 2022, that the MTA had received over $15 billion in COVID-19 aid from the federal government.

177.    U.S. Senator Chuck Schumer, a key sponsor of this aid, stated on January 12, 2022, that "the federal relief money will also help fund the planned capital spending needed to improve the system." ESA is the largest project in the MTA's capital improvement program and it was devastated by the pandemic.

178.    On October 13, 2022, two members of the United States House of Representatives sent a letter to the Chairs of the House Committee on Transportation and Infrastructure and Subcommittee on the Coronavirus Crisis demanding a hearing and testimony from the CEO and Chair of the MTA to address the MTA's misuse and mismanagement of this $15 billion dollars in COVID-19 relief aid.

179.     The letter cites to decades of "woeful mismanagement" at the MTA and a lack of clarity as to where the billions in aid was spent.   To date, there has been no report of any action taken by the Committee.

180.     The MTA's failure to negotiate and address TPC's COVID-19 Impact Costs submissions, which the MTA requested, and for which the MTA received $15.7 billion in federal funds, is unconscionable and in bad faith.  The MTA's sham Dispute Resolution Process will not provide a just and fair resolution of TPC's COVID-19 cost submissions.

## COUNT ONE: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

181.     Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" and "301" through "304" with the same force and effect as if set forth at length herein.

182.     The duty of good faith and fair dealing is implied in every contract in the State of New York and requires the exercise of all discretionary contract rights in good faith.

183.     Although the MTA has acknowledged that the ESA Program was a "hot mess;" that the MTA "tore" the schedule apart and put it back together in a completely different fashion; and that Plaintiffs suffered massive damages as a result, the MTA has administered the Dispute Resolution Process in a manner designed to deprive Plaintiffs of compensation to which they are rightfully entitled, in bad faith.

184.     This includes the MTA denying claims by Plaintiffs on the ESA Program that it knew were legitimate and should be paid.

185.     The MTA has further attempted to leverage Plaintiffs into withdrawing valid claims or accepting cents on the dollar with extra-contractual threats of assessing liquidated damages, denying reasonable scope transfers, and abusing the Dispute Resolution Process.

186.    The MTA has gutted the Dispute Resolution Process by feigning good faith compliance with its obligation and negotiation while ensuring, through *ex parte* communications and by placing biased employees in a decision-making capacity, that the MTA will achieve its desired outcomes irrespective of the merits.

187.    The MTA has acted in bad faith by: pre-determining the outcome of disputes; dictating the outcome of disputes to MTA employees responsible for rendering final determinations of those disputes regardless of the merits; failing to cooperate in good faith with the Dispute Resolution Process; engaging in an intentional effort to manipulate the results of the Dispute Resolution Process; failing or refusing to act on Plaintiffs' reasonable requests for equitable adjustment and claims for compensation, thereby precluding Plaintiffs from even availing themselves of the Dispute Resolution Process; failing or refusing to compensate Plaintiffs for damages caused by a knowingly defective program design; extra-contractually conditioning Plaintiffs' compensation for direct costs on Plaintiffs' waiver of associated impact costs, despite Plaintiffs' contractual entitlement to recover both; repeatedly taking positions that defy logic, the project record, the plain language of the parties' agreements and New York law; and otherwise improperly administering the Dispute Resolution Process.

188.    The Contracts are between the same parties, inter-related, and are each integral pieces of the broader ESA Program.  Indeed, the Contracts contain cross-default provisions, and the MTA has acknowledged that Mod 24 was intended to create "one TPC" for the purposes of the ESA Program moving forward.  Accordingly, while the MTA has breached each TPC Contract independently, a breach as to one is also a breach as to all.

189.    Based on the foregoing, Plaintiffs have incurred losses, costs, damages and expenses in an amount to be proven at trial, but believed to exceed $330 million, for which the MTA is liable, together with interest, costs, disbursements and attorneys' fees, if applicable.

## COUNT TWO:  DECLARATORY JUDGMENT

190.    Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" and "301" through "304" with the same force and effect as if set forth at length herein.

191.    An illusory agreement is one in which the one party gives consideration that is so insubstantial as to impose no obligation at all.  An agreement is also illusory where a party fails to exercise its discretion in good faith.

192.    Illusory agreements are unenforceable.

193.    A dispute resolution provision is illusory and therefore unenforceable if it favors one party to such an extent as to render the provision a dead letter.

194.    The dispute resolution mechanisms and the Dispute Resolution Process in the Contracts are illusory and therefore unenforceable.

195.    The Dispute Resolution Process lacks mutuality because it essentially imposes no obligation on the MTA.  The Dispute Resolution Process gives the MTA unilateral authority to select an individual to adjudicate disputes between the MTA and Plaintiffs and thereby insulate itself from having to pay Plaintiffs sums the MTA owes.

196.    Moreover, the Dispute Resolution Process has no guardrails to ensure that an individual appointed by the MTA adjudicates disputes without bias in favor of MTA.

197.    To the contrary, Plaintiffs have no meaningful way to challenge the outcome of the one-sided dispute resolution set forth in the Dispute Resolution Process.

198.    Plaintiffs' only way of contesting the MTA-appointed individual's biased and unfair resolution of the Disputes Plaintiffs bring is to challenge the decisions in New York State Court under Article 78 or in a federal court in New York City.

199.    But these challenges are of little aid to Plaintiffs.  Indeed, in either forum, the court's review is circumscribed to whether the determination of MTA was arbitrary, capricious, or an abuse of discretion.

200.    Plaintiffs are also purportedly barred from offering new evidence proving that the decision was arbitrary and capricious or an abuse of discretion.

201.    In effect, the MTA is allowed to resolve Disputes in its favor, whether fairly or unfairly, with impunity.

202.    The MTA uses the Dispute Resolution Process to keep its bad faith conduct from review and to foist inequitable results on Plaintiffs.

203.    It is unconscionable and unenforceable, and Plaintiffs' purported remedies under the Dispute Resolution Process are illusory.

204.    The Dispute Resolution Process is not just illusory on paper.  Indeed, the MTA's actual behavior regarding its subversion of the Dispute Resolution Process, as described above, establishes that the Dispute Resolution Process is illusory and unenforceable.  By failing to adjudicate disputes between the MTA and Plaintiffs fairly, the MTA has failed to exercise its discretion under the Dispute Resolution Process in good faith, rendering the provision illusory and unenforceable.

205.    Due to the MTA's bad faith conduct, Plaintiffs cannot receive a fair, complete, or just resolution under the Dispute Resolution Process.

206.    Whether the Dispute Resolution Process and related provisions are illusory and unenforceable therefore presents an actual case or controversy.

207.    A declaratory judgment will serve a useful purpose in clarifying or settling the legal issues involved in this dispute.  It would also finalize the controversy and offer relief from uncertainty regarding the enforceability of the Dispute Resolution Process.

208.    Accordingly, the Court should declare the Dispute Resolution Provisions of the Contracts are illusory and unenforceable but leave the remainder of the contracts in place.

## COUNT THREE: BREACH OF CONTRACT

209.    Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" and "301" through "304" with the same force and effect as if set forth at length herein.

210.    The Contracts are valid and binding agreements.

211.    The Contracts are between the same parties, inter-related, and are each integral pieces of the broader ESA Program.  Indeed, the Contracts contain cross-default provisions, and the MTA has acknowledged that Mod 24 was intended to create "one TPC" for the purposes of the ESA Program moving forward. Accordingly, while the MTA has breached each TPC Contract independently, a breach as to one is also a breach as to all.

212.    Plaintiffs have performed their obligations under the Contracts or said conditions have been prevented or waived by the MTA.

213.    The MTA has breached the Contracts.

214.    Plaintiffs have suffered damages as a result of the MTA's breaches of the Contracts in an amount to be proven at trial, but believed to exceed $330 million, for which the MTA is liable, together with interest, costs, disbursements and attorneys' fees, if applicable.

**COUNT FOUR:  VIOLATION OF THE PROCEDURAL DUE PROCESS
CLAUSES UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE
U.S. CONSTITUTION**

215.    Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" and "301" through "304" with the same force and effect as if set forth at length herein.

216.    Section 1983 of Title 42 of the U.S. Code provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" 42 U.S.C. § 1983.

217.    The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law."

218.    The Fifth Amendment's due process protection applies to the states through its incorporation into the due process clause of the Fourteenth Amendment.

219.    The Fourteenth Amendment to the United States Constitution provides that no state actor can "deprive any person of life, liberty, or property, without due process of law."

220.    Procedural due process requires notice and a hearing prior to an individual or entity being deprived of its property rights.

221.    Plaintiffs have protected property interests in the Contracts, including their rights thereunder with respect to compensation for the tremendous volume of changes, delays, disruptions, and other impacts to its work and services.

222.    Since Plaintiffs have achieved substantial completion, the Contracts are not terminable for convenience.

223.    The MTA deprived Plaintiffs of their interests and rights without due process.

224.    As set forth above, the Dispute Resolution Process is illusory, has been administered by the MTA in bad faith, and allows the MTA to resolve disputes in its favor, whether fairly or unfairly, with impunity.

225.    Plaintiffs have therefore received no actual opportunity to be heard at all. The Dispute Resolution Process is a sham, and Plaintiffs have no mechanism to seek review or obtain remedy for the MTA's breach of the Contracts.

226.    The MTA, as a New York public benefit corporation, is liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

227.    The MTA has acted under color of state law and pursuant to an official policy or custom, and bona fide controversy exists between the parties.

228.    Based on the foregoing, Plaintiffs have incurred losses, costs, damages, and expenses in an amount to be proven at trial, but believed to exceed $330 million, for which the MTA is liable, together with interest, costs, disbursements and attorneys' fees, if applicable.

### COUNT FIVE:  VIOLATION OF THE TAKINGS CLAUSE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

229.    Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" and "301" through "304" with the same force and effect as if set forth at length herein.

230.    Section 1983 of Title 42 of the U.S. Code provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" 42 U.S.C. § 1983.

231.    The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property" shall not be "taken for public use, without just compensation."

232.    The Fifth Amendment's protection against the taking of private property without just compensation applies to the states through its incorporation into the due process clause of the Fourteenth Amendment.

233.    The Contracts and/or Plaintiffs' rights thereunder constitute a property interest within the meaning of the Fifth Amendment. Thus, the MTA may not deprive Plaintiffs the benefits of their contractual property rights without just compensation.

234.    Plaintiffs' protected property interests in the Contracts include their rights thereunder with respect to compensation for the tremendous volume of changes, delays, disruptions, and other impacts to its work and services.  These changes, delays, disruptions, and other impacts to Plaintiffs' work and services have impacted Plaintiffs' reasonable return on their investments, and Plaintiffs have suffered losses as a result of the MTA's actions.

235.    Since Plaintiffs have achieved substantial completion, the Contracts are not terminable for convenience.

236.    The MTA deprived Plaintiffs of these interests and rights without just compensation.

237.    The foregoing conduct of the MTA was intended to benefit the MTA and the public.

238.    The MTA has failed to provide just compensation to Plaintiffs.  To the contrary, it has administered the Dispute Resolution Process in a bad faith effort to ensure that Plaintiffs do not receive just compensation.

239.    The MTA, as a New York public benefit corporation, may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

240.    The MTA has acted under color of state law and pursuant to an official policy or custom, and bona fide controversy exists between the parties.

241.    Based on the foregoing, Plaintiffs have incurred losses, costs, damages, and expenses in an amount to be proven at trial, but believed to exceed $330 million, for which the MTA is liable, together with interest, costs, disbursements and attorneys' fees, if applicable.

### COUNT SIX:  VIOLATION OF THE RIGHT TO REDRESS OF GRIEVANCES UNDER THE FIRST AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

242.    Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" and "301" through "304" with the same force and effect as if set forth at length herein.

243.    Section 1983 of Title 42 of the U.S. Code provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"  42 U.S.C. § 1983.

244.    The First Amendment provides that "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances."

245.    The First Amendment's protection of the right to petition applies to the states through its incorporation into the due process clause of the Fourteenth Amendment.

246.    The right to redress protects the right of individuals and entities to challenge the actions of governmental actors and to enforce their rights.

247.    The Dispute Resolution Process gives the MTA unilateral authority to select an individual to adjudicate disputes between the MTA and Plaintiffs and thereby insulate itself from having to pay Plaintiffs sums the MTA owes.

248.    Moreover, the Dispute Resolution Process has no guardrails to ensure that an individual appointed by MTA adjudicates Disputes without bias in favor of the MTA.

249.    To the contrary, Plaintiffs has no meaningful way to challenge the outcome of the one-sided dispute resolution set forth in the Dispute Resolution Process.

250.    Plaintiffs' only way of contesting the MTA-appointed individual's biased and unfair resolution of the Disputes Plaintiffs bring is to challenge the decisions in New York State Court under Article 78 or in a federal court in New York City.

251.    But these challenges are of little aid to Plaintiffs.  Indeed, in either forum, the court's review is circumscribed to whether the determination of MTA was arbitrary, capricious, or an abuse of discretion.

252.    Plaintiffs are also purportedly barred from offering new evidence proving that the decision was arbitrary and capricious or an abuse of discretion.

253.    In effect, the MTA is allowed to resolve disputes in its favor, whether fairly or unfairly, with impunity.

254.    The MTA uses the Dispute Resolution Process to keep its bad faith conduct from review and to foist inequitable results on Plaintiffs.

255.     It is unconscionable and unenforceable, and Plaintiffs' purported remedies under the Dispute Resolution Process are tantamount to no ability to seek redress for the actions of the MTA at all.

256.     The MTA, as a New York public benefit corporation, may be held liable for this violation of the United States Constitution under 42 U.SC. § 1983.

257.     The MTA has acted under color of state law and pursuant to an official policy or custom, and bona fide controversy exists between the parties.

258.     In addition, the MTA has unconstitutionally conditioned Plaintiffs' right to receive the benefit of the contract on Plaintiffs waiving their First Amendment right to petition the government for a redress of grievances.

259.     Based on the foregoing, Plaintiffs have incurred losses, costs damages and expenses in an amount to be proven at trial, but believed to exceed $330 million, for which the MTA is liable, together with interest, costs, disbursements and attorneys' fees, if applicable.

## COUNT SEVEN: VIOLATION OF ARTICLE I, SECTION 6 OF THE NEW YORK STATE CONSTITUTION (PROCEDURAL DUE PROCESS CLAUSE)

260.     Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" and "301" through "304" with the same force and effect as if set forth at length herein.

261.     Article I, Section 6 of the New York Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law."

262.     As a New York public benefit corporation, the MTA is a state actor.

263.     Procedural due process requires notice and a hearing prior to an individual or entity being deprived of its property rights.

264.     Plaintiffs have protected property interests in the Contracts, including their rights thereunder with respect to compensation for the tremendous volume of changes, delays, disruptions, and other impacts to its work and services.

265.     Since Plaintiffs have achieved substantial completion, the Contracts are not terminable for convenience.

266.     The MTA deprived Plaintiffs of their interests and rights without due process.

267.     As set forth above, the Dispute Resolution Process is illusory, has been administered by the MTA in bad faith and allows the MTA to resolve disputes in its favor, whether fairly or unfairly, with impunity.

268.     Plaintiffs have therefore received no actual opportunity to be heard at all.  The Dispute Resolution Process is a sham, and Plaintiffs have no mechanism to seek review or obtain remedy for the MTA's breach of the Contracts.

269.     Based on the foregoing, Plaintiffs have incurred losses, costs, damages, and expenses in an amount to be proven at trial, but believed to exceed $330 million, for which the MTA is liable, together with interest, costs, disbursements and attorneys' fees, if applicable.

## COUNT EIGHT: VIOLATION OF ARTICLE I, SECTION 7 OF THE NEW YORK STATE CONSTITUTION (TAKINGS CLAUSE)

270.     Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" and "301" through "304" with the same force and effect as if set forth at length herein.

271.     Article I, Section 7 of the New York Constitution ("NY Takings Clause") provides that "private property" shall not be "taken for public use, without just compensation."

272.     The MTA, as a New York public benefit corporation, is a state actor.

273.    The Contracts and/or Plaintiffs' rights thereunder constitute a property interest within the meaning of the NY Takings Clause.  Thus, the MTA may not deprive Plaintiffs the benefits of their contractual property rights without just compensation.

274.    Plaintiffs' protected property interests in the Contracts include their rights thereunder with respect to compensation for the tremendous volume of changes, delays, disruptions, and other impacts to its work and services.

275.    Since Plaintiffs have achieved substantial completion, the Contracts are not terminable for convenience.

276.    The MTA deprived Plaintiffs of these interests and rights without just compensation.

277.    The foregoing conduct of the MTA was intended to benefit the MTA and the public.

278.    The MTA has failed to provide just compensation to Plaintiffs.  To the contrary, it has administered the Dispute Resolution Process in a bad faith effort to ensure that Plaintiffs do not receive just compensation.

279.    Based on the foregoing, Plaintiffs have incurred losses, costs, damages, and expenses in an amount to be proven at trial, but believed to exceed $330 million, for which the MTA is liable, together with interest, costs, disbursements and attorneys' fees, if applicable.

## COUNT NINE: VIOLATION OF ARTICLE I, SECTION 9 OF THE NEW YORK STATE CONSTITUTION (RIGHT TO PETITION THE GOVERNMENT)

280.    Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" and "301" through "304" with the same force and effect as if set forth at length herein.

281.    Article I, Section 9 of the New York Constitution provides that "No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government."

282.    The right to petition the government protects the right of individuals and entities to challenge the actions of governmental actors and to enforce their rights.

283.    The MTA, as a New York public benefit corporation, is a state actor.

284.    The Dispute Resolution Process gives the MTA unilateral authority to select an individual to adjudicate disputes between the MTA and Plaintiffs and thereby insulate itself from having to pay Plaintiffs sums the MTA owes.

285.    Moreover, the Dispute Resolution Process has no guardrails to ensure that an individual appointed by MTA adjudicates Disputes without bias in favor of the MTA.

286.    To the contrary, Plaintiffs has no meaningful way to challenge the outcome of the one-sided dispute resolution set forth in the Dispute Resolution Process.

287.    Plaintiffs' only way of contesting the MTA-appointed individual's biased and unfair resolution of the Disputes Plaintiffs bring is to challenge the decisions in New York State Court under Article 78 or in a federal court in New York City.

288.    But these challenges are of little aid to Plaintiffs.  Indeed, in either forum, the court's review is circumscribed to whether the determination of MTA was arbitrary, capricious, or an abuse of discretion.

289.    Plaintiffs are also purportedly barred from offering new evidence proving that the decision was arbitrary and capricious or an abuse of discretion.

290.    In effect, the MTA is allowed to resolve disputes in its favor, whether fairly or unfairly, with impunity.

291.    The MTA uses the Dispute Resolution Process to keep its bad faith conduct from review and to foist inequitable results on Plaintiffs.

292.    It is unconscionable and unenforceable, and Plaintiffs' purported remedies under the Dispute Resolution Process are tantamount to no ability to seek redress for the actions of the MTA at all.

293.    Based on the foregoing, Plaintiffs have incurred losses, costs damages and expenses in an amount to be proven at trial, but believed to exceed $330 million, for which the MTA is liable, together with interest, costs, disbursements and attorneys' fees, if applicable.

## COUNT TEN: CARDINAL CHANGE

294.    Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs of the Complaint numbered "1" through "180" with the same force and effect as if set forth at length herein.

295.    The MTA's dramatic expansion of the scope of the work on the ESA Program, well beyond that contemplated in the original scope of work, constitutes cardinal changes to the work resulting in a breach and repudiation of the contracts, and entitling Plaintiffs to quantum meruit recovery of the reasonable value of its work, plus overhead and profit.

296.    As a matter of law, Plaintiffs cannot be relegated to payment terms under the contracts which contemplated an entirely different scope of work than ultimately directed by the MTA.  Here, the quantum meruit value of Plaintiffs' outstanding work exceeds $330 million.

297.    During Plaintiffs performance of its work on the Program, the MTA unreasonably changed, disrupted and delayed Plaintiffs' work, and interfered with and disrupted Plaintiffs' operations, as a result of which Plaintiffs were prevented from maintaining their planned schedule, sequence for the completion of the work.

298.    As stated above, the MTA orchestrated changes to the work that were radical and fundamentally changed the essentially identity and main purpose of the Contracts, from that planned for and otherwise contemplated by the parties.

299.    As a result of these constant delays and changes, Plaintiffs were directed and caused to perform substantial work outside of the scope of the contracts, including change order work and additional work.

300.    All of the aforementioned actions and/or omissions by the MTA caused the work to be unreasonably extended and disrupted, and prevented performance of the work that Plaintiffs reasonably anticipated could and would be performed forcing Plaintiffs to work in an inefficient, non-productive, and out-of-sequence manner.

301.    Below is an overview of the base and revised contract amounts for Contract CS179, baseline and revised completion schedules, unpaid contract amounts and requests for reimbursement for the tremendous number of unresolved scope changes and impacts:

| Contract Value, Schedule and Open Items | CS179 |
|---|---|
| Original Contract Value | $    550,388,000 |
| Current Contract Value | $    767,722,456 |
| Executed Change Orders/Modifications | $    217,334,456 |
| Total No. of Change Orders/Modifications | 705 |
| | |
| Notice to Proceed | 3/31/2014 |
| Original Project Duration | **2,065** |
| Original Completion Date | **11/25/2019** |
| Revised Completion (Projected in Red) | **7/31/2025[4]** |
| Revised Project Duration (Projected in Red) | **4,140** |
| Days Added (Projected in Red) | **2075** |
| Substantial Completion Date | 12/30/2022 |
| Days from NTP to MTA Issued Substantial Completion | 3,197 |

---

[4] Despite numerous requests the MTA still cannot provide TPC with a schedule for the required access to the site for final completion of the project to confirm this end date.

| | |
|---|---|
| Days from MTA Issued Substantial Completion to Projected Completion | **943 plus** |
| | |
| Outstanding Contract Balance | |
| Retainage | $7,962,976.96 |
| Unresolved REAs | $83,126,872 |
| Unresolved COVID (MTA CPR 344) | $37,408,060 |
| | |
| Total | $128,497,908 |

302.    Below is an overview of the base and revised contract amounts for Contract CM007, baseline and revised completion schedules, unpaid contract amounts and unresolved requests for scope changes and impacts:

| Contract Value, Schedule and Open Items | CM007 |
|---|---|
| Original Contract Value | $ 663,077,800 |
| Current Contract Value | $ 694,413,752 |
| Executed Change Orders/Modifications | $ 31,335,952 |
| Total # of Change Orders/Modifications | 206 |
| Notice to Proceed | 4/11/2016 |
| Original Project Duration | **1,521** |
| Original Completion Date | **6/24/2020** |
| Revised Completion (Projected in Red) | **12/31/2024** |
| Revised Project Duration (Projected in Red) | **3,186** |
| Days Added (Projected in Red) | **1,651** |
| Issued Substantial Completion | 10/31/2023 |
| Days from NTP to MTA Issued SC | 2,759 |
| Days from MTA Issued SC to Projected Completion | **427** |
| | |
| Outstanding Contract Balance | $2,198,868.70 |
| Retainage | $8,629,788.56 |
| Unresolved REAs | $61,627,003 |
| Unresolved COVID CPR | $64,152,676 |
| | |
| Total | $136,608,336.26 |

303.    Below is an overview of the base and revised contract amounts for Contract CM006, baseline and revised completion schedules:

| Contract Value and Schedule and Open Items | CM006 |
|---|---|
| Original Contract Value | $ 294,201,750 |
| Current Contract Value | $ 347,018,452 |
| Executed Change Orders/Modifications | $ 52,816,702 |
| Total # of Change Orders/Modifications | 48 |
| | |
| Notice to Proceed | 3/31/2014 |
| Original Project Duration | **1,065** |
| Original Completion Date | **2/28/2017** |
| Revised Completion (Projected in Red) | **12/31/2024** |
| Actual Project Duration (Projected in Red) | **3,928** |
| Days Added (Projected in Red) | **2,863** |
| Issued Substantial Completion | 3/1/2019 |
| Days from NTP to MTA Issued SC | 1,796 |
| Days from MTA Issued SC to Projected Completion | **2,132** |
| | |
| DRB Decision | $66,245,837 |

304.    Below is an overview of the base and revised contract amounts for Contract CQ032, baseline and revised completion schedules and TPC's unpaid contract balance and retainage:

| Contract Value, Schedule and Open Items | CQ032 |
|---|---|
| Original Contract Value | $ 147,377,000 |
| Current Contract Value | $ 264,210,255 |
| Executed Change Orders/Modifications | $ 116,833,255 |
| Total # of Change Orders/Modifications | 96 |
| | |
| Notice to Proceed | 8/10/2011 |
| Original Project Duration | **1,190** |
| Original Completion Date | **11/11/2014** |
| Revised Completion (Projected in Red) | **12/31/2024** |
| Revised Project Duration (Projected in Red) | **4,892** |
| Days Added (Projected in Red) | **3,703** |
| Issued Substantial Completion | 3/1/2019 |
| Days from NTP to MTA Issued SC | 2,760 |
| Days from MTA Issued Substantial Completion to Projected Completion | **2,132** |

| | |
|---|---:|
| Outstanding Contract Balance | $309,472.36 |
| Retainage | $2,097,047.82 |
| | |
| Total | $2,406,520.18 |

305.     By and through the above actions, including enacting tens of thousands of significant changes, causing the projects to extend over a decade longer than anticipated and increasing the scope of the contracts by many hundreds of millions of dollars, the MTA invalidated the Contracts under the ESA Program and is therefore liable to Plaintiffs in quantum meruit for the fair and reasonable value of the work performed by Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Tutor Perini Corporation and Frontier-Kemper Constructors, Inc. respectfully demand judgment in this action against the Metropolitan Transportation Authority as follows:

A.  Awarding judgment for Plaintiff Tutor Perini Corporation and against Defendant Metropolitan Transportation Authority in an amount to be determined at trial;

B.  Awarding judgment for Plaintiff Frontier-Kemper Constructors, Inc. and against Defendant Metropolitan Transportation Authority in an amount to be determined at trial;

C.  Declaring that the Metropolitan Transportation Authority's Dispute Resolution Process unenforceable;

D.  Declaring that the Metropolitan Transportation Authority violated the First, Fifth, and Fourteenth Amendments to the United States Constitution;

E.  Declaring that the Metropolitan Transportation Authority violated Article I, Sections 6, 7, and 9 of the New York State Constitution;

F.  Awarding attorneys' fees, costs, and disbursements of this action; and

G.  Awarding such further relief as the Court deems just and proper.

Dated:          May 19, 2025          HINCKLEY, ALLEN & SNYDER LLP
                Albany, New York

                                      By:  _James J. Barriere_

                                           James J.  Barriere, Esq.
                                           Christopher V. Fenlon, Esq.
                                           Chad J. Caplan, Esq.
                                           Janelle A. Pelli, Esq.
                                           30 South Pearl Street, Suite 1101
                                           Albany, New York 12207
                                           P: (518) 396-3100
                                           E: jjbarriere@hinckleyallen.com
                                               cfenlon@hinckleyallen.com
                                               ccaplan@hinckleyallen.com
                                               jpelli@hinckleyallen.com

                                           *Attorneys for Plaintiffs*
                                           *Tutor Perini Corporation and*
                                           *Frontier-Kemper Constructors, Inc.*